UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN McARN,

                Plaintiff,

v.

Detroit Police Officer DONALD CLARK,
OFFICER KEVIN ALFREY,
DETECTIVE NOE GARCIA,
DETECTIVE GARY PRZYBYLA,
OFFICER ANDREA SMITH,
And JOHN DOE OFFICERS 1 and 2,

                Defendants.

_____/

Case No. 19-cv-13703

Paul D. Borman
United States District Judge

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 39)

**INTRODUCTION**

      This case arises out of the arrest and detention by the Detroit Police Department (DPD) of Plaintiff Brian McArn, against whom criminal charges were never filed. Plaintiff has asserted federal constitutional and state tort claims against Defendants Detectives Noe Garcia and Gary Przybyla, Officers Donald Clark, Kevin Alfrey, and Andrea Smith, and John Doe Officers 1 and 2. Now before the Court is Detectives Garcia and Przybyla and Officers Clark, Alfrey, and Smith's Motion for Summary Judgment.

1

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Background

On August 9, 2016, Plaintiff Brian McArn was released from prison on probation, after serving 28 years on a parolable life sentence. (ECF No. 40-1, Dep. of B. McArn, PageID 452, PageID 458–59). Plaintiff is 5'11" tall and weighs about 200 pounds. (ECF No. 40-1, Mugshot Report, PageID 711).

### B.    Statement of Facts

On July 10, 2018, Keri Jane Waterman reported the theft of her Louis Vuitton wallet from her place of employment, the private Quicken Loans office in the Chrysler House Building at 707 Griswold, Detroit. (ECF No. 39-2, Incident Report, PageID 334–37). DPD assigned the case to Defendant Detective Noe Garcia. Detective Garcia had been in his position since 2014, and he had never been reprimanded or suspended.[1] (ECF No. 40-1, Dep. of N. Garcia, PageID 417–20).

**The Investigation**

Twelve days later, Detective Garcia interviewed Ms. Waterman. She told him that on July 10, she left her purse on her desk to attend a morning meeting, and returned around noon. (ECF No. 39-2, Statement of K. Waterman, PageID 338–40). Soon thereafter, she received a text from her bank asking for approval on a purchase;

---

[1] Later, in 2019, Detective Garcia was suspended for twelve days for a DUI. (ECF No. 40-1, Dep. of N. Garcia, PageID 420).

2

she looked in her purse and discovered that her wallet was missing. (ECF No. 39-2, Statement of K. Waterman, PageID 339). Ms. Waterman told her team what had happened, and Janelle Wooley, a co-worker, told her that she had seen a man walk by Ms. Waterman's desk.  (ECF No. 39-2, Statement of K. Waterman, PageID 339).

Detective Garcia also collected, from Ms. Waterman's office building, security video footage from around the time that the wallet went missing. (ECF No. 40-1, Dep. of N. Garcia, PageID 426). From that footage, Detective Garcia identified a suspect and his car, and then, through a LEIN check on the car's license plate, discovered that the car was registered to Plaintiff. (ECF No. 40-1, Dep. of N. Garcia, PageID 426). (Although neither party disputes Detective Garcia's testimony to these facts, neither party has produced the video to the Court. Instead, the defendants have attached to their Motion for Summary Judgment a "Security Report" from the Central Business District Neighborhood Watch that includes still pictures and descriptions of a man and a black Cadillac, and the statement, "On Tuesday, July 10, 2018, at 11:00 a.m., the above pictured subject made unauthorized access to the Chrysler House Building . . . ." (ECF. No 39-3, BOL Report, PageID 342–46)).

After that, Detective Garcia created photo lineups that included Plaintiff. (ECF No. 40-1, Dep. of N. Garcia, PageID 431). On July 24, Detective James Ronan showed one of these lineups—which comprised photos of Plaintiff and five other men—to Hade Merhi, a coworker of Ms. Waterman. Mr. Merhi recognized Plaintiff,

stating that he saw Plaintiff in his office on the day Ms. Waterman's wallet was taken, and describing the man he saw as a 5'10", 175-pound, dark-skinned Black male. (ECF No. 39-4, Statement of H. Merhi, PageID 348–51). Lineups were also shown to another of Ms. Waterman's co-workers and to "an employee at a cell phone store," but both of these resulted in "no picks." (ECF No. 40-1, Dep. of N. Garcia, PageID 431).

Based on the LEIN check and the identification by Mr. Merhi, Detective Garcia "requested [Defendant Officers Donald Clark and Kevin Alfrey] to arrest Plaintiff." (ECF No. 40-1, Dep. of N. Garcia, PageID 424–26). Detective Garcia did not seek a warrant because he believed he had probable cause and he "wanted to interview [Plaintiff] first." (ECF No. 40-1, Dep. of N. Garcia, PageID 427).

In their depositions, both Officer Clark and Officer Alfrey had trouble remembering the events of this case. (ECF No. 40-1, Dep. of D. Clark, PageID 647; ECF No. 40-1, Dep. of K. Alfrey, PageID 685). However, Officer Clark said that he was "sure" that he "would have gotten [his] probable cause directly from the officer in charge" before arresting Plaintiff. (ECF No. 40-1, Dep. of D. Clark, PageID 644, 646). Officer Alfrey said that he "may have," and later that he "probably," knew what the probable cause was when he arrested Plaintiff. (ECF No. 40-1, Dep. of K. Alfrey, PageID 691, 693).

4

**The Arrest**

On October 30, Officers Clark and Alfrey drove to Plaintiff's home in Detroit and left a business card with Plaintiff's wife. (ECF No. 9, Amended Complaint, PageID 59; ECF No. 15, D. Clark Answer, PageID 142). Plaintiff soon called them back and set up an appointment to meet at the Detroit Police Department, 3rd Precinct. (ECF No. 40-1, Dep. of B. McArn, PageID 476).

Two days later, on November 1, Plaintiff met Officers Clark and Alfrey at the scheduled time and place. (ECF No. 39-5, Arrest Report, PageID 353). The officers immediately arrested Plaintiff and drove him to the Detroit Detention Center, where he was held for questioning. (ECF No. 40-1, Dep. of B. McArn, PageID 477). Neither officer remembers Plaintiff saying anything to them during his arrest. (ECF No. 40-1, Dep. of D. Clark, PageID 650–51; ECF No. 40-1, Dep. of K. Alfrey, 696). Plaintiff remembers the officers telling him that they were handcuffing him "for their safety and [his] safety as well," and then "not really" having a conversation with him in the car, beyond their mentioning "something to do with a larceny." (ECF No. 40-1, Dep. of B. McArn, PageID 477–78). He also notes that, "on several occasions," he told them "that he was not the person they were looking for." (ECF No. 9, Amended Complaint, PageID 61).

5

**The Interrogation**

That same day, Detective Garcia asked Defendant Detective Gary Przybyla to question Plaintiff, because Detective Garcia was on leave. (ECF No. 40-1, Dep. of N. Garcia, PageID 430; ECF No. 40-1, Dep. of G. Przybyla, PageID 542). Detective Przybyla asked Plaintiff about "a string of larcenies in which [the car registered to Plaintiff] was identified." (ECF No. 40-1, Dep. of B. McArn, PageID 479–80). He also showed Plaintiff stills of the suspect and the car from the video that Detective Garcia had obtained. (ECF No. 40-1, Dep. of B. McArn, PageID 480–81; ECF No. 40-1, Dep. of G. Przybyla, PageID 543–45). Plaintiff told Detective Przybyla that the suspect in the photo was Anthony Bowden, his cousin, not him—and that Mr. Bowden drove the car from the video, but Plaintiff had registered it in his name, as a favor to Mr. Bowden. (ECF No. 40-1, Dep. of B. McArn, PageID 480–82; ECF No. 40-1, Dep. of G. Przybyla, PageID 543–45). Detective Przybyla "looked at the photo, looked at Plaintiff, and said, you know what, based upon what I have in front of me, you're not the person in the surveillance video." (ECF No. 40-1, Dep. of G. Przybyla, PageID 543).

**The Discharge**

Detective Przybyla then called Detective Garcia and told him what Plaintiff had said about his cousin, and that, "after looking at [Plaintiff] in person," he did not think it was Plaintiff in the video. (ECF No. 40-1, Dep. of N. Garcia, PageID 428;

ECF No. 40-1, Dep. of G. Przybyla, PageID 544). In response, Detective Garcia told Detective Przybyla to release Plaintiff. (ECF No. 40-1, Dep. of G. Przybyla, PageID 545). So, still on November 1st, Detective Przybyla followed his office's policy for discharge and submitted the papers for his discharge. (ECF No. 40-1, Dep. of G. Przybyla, PageID 535–42).

However, because he was on state parole, Plaintiff was held for another 8 days by the Michigan Department of Corrections (MDOC)—but not by DPD. (ECF No. 9, Amended Complaint, PageID 63; ECF No. 39-8, Detainer Request, PageID 375–76; ECF No. 40-1, Dep. of MDOC Parole Officer A. Bridgewater, PageID 580). He remained in MDOC custody until his parole officer recommended his release. (ECF No. 40-1, Dep. of A. Bridgewater, PageID 611–12).

### C.   Procedural History

On August 10, 2020, Plaintiff filed his First Amended Complaint and Demand for Jury Trial. (ECF No. 9). At the time, the defendants listed were Detectives Noe Garcia and Gary Przybyla; Sergeant Chimene Irvin; Lieutenant Barbara Kozloff; Corrections Officer James Abriel; Officers Kevin Alfrey, Donald Clark, Sharhonda Canty, and Andrea Smith; and John Doe Officers 1 and 2, all listed "in their individual and official capacities." (ECF No. 9).

The Complaint asserted the following claims, against all the defendants:

- Count I: Federal Claims: Violations of 42 U.S.C. 1983: False Detention, Arrest, Imprisonment and Confinement (PageID 64–67);

- Count II: State Claims: Willful and Wanton Misconduct, Deliberate Indifference/Gross Negligence (PageID 67–69);

- Count III: State Claims: False Imprisonment (PageID 69–71);

- Count IV: State Claims: Intentional Infliction of Emotional Distress (PageID 71–73).

Corrections Officer Abriel was dismissed without prejudice on December 14, 2020 (ECF No. 29, Stipulated Order), and Sergeant Irvin, Lieutenant Kozloff, and Officer Canty were dismissed without prejudice on April 9, 2021 (ECF No. 38, Stipulated Order).

### D.    Motion for Summary Judgment

On May 27, 2021, Detectives Garcia and Przybyla and Officers Alfrey, Clark, and Smith filed the Motion for Summary Judgment currently before the Court. (ECF No. 39). They seek dismissal of all the claims against them. Specifically, they argue that they "are entitled to summary judgment" on Plaintiff's:

- "constitutional claims, because there was no constitutional violation and [they] are shielded by qualified immunity" (PageID 323–26),

8

- "state tort claims, because [they] are shielded by common law immunity for intentional torts and [Plaintiff] was lawfully investigated" (PageID 326–27), and

- "gross negligence claim, because there is no independent cause of action for gross negligence and [their] actions were intentional." (PageID 328).

Plaintiff filed his Opposition to this Motion for Summary Judgment on June 15, 2021. (ECF No. 40). At the beginning of this Opposition, Plaintiff stipulated to the dismissal of Officer Smith and Detective Przybyla. (PageID 378).

Detectives Garcia and Przybyla and Officers Alfrey, Clark, and Smith filed a reply to Plaintiff's Opposition on September 28, 2021. (ECF No. 43).

## II.   LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.   ANALYSIS

Per Plaintiff's stipulation, the Court hereby dismisses Officer Smith and Detective Przybyla from this case. The Court also dismisses John Does 1 and 2 because the docket reflects that they still have not been served with the Amended Complaint, which was filed over a year ago, and the Plaintiff has not provided any good cause for the delay. Fed R. Civ. P. 4(m); *Peterson v. City of Detroit*, 2020 U.S. App. LEXIS 1830, at *2 (6th Cir. Jan. 21, 2020) (upholding trial court's dismissal of John Doe defendants where the plaintiff "failed to serve [them] within ninety days and presented no good cause to excuse his omission"). Furthermore, Plaintiff has not made any factual allegations directed specifically at these John Doe defendants. *Hale-Camacho v. Tipton Cty. Sheriff's Dep't*, 2020 U.S. App. LEXIS 15204, at *2–3 (6th Cir. May 12, 2020) (upholding dismissal of John Does "because [the plaintiff] made no factual allegations against them).

11

The remaining defendants are Detective Garcia, Officer Clark, and Officer Alfrey. For the reasons listed below, the Court will grant summary judgment to these Defendants on all of Plaintiff's claims.

> **A.   Defendants are entitled to summary judgment on Plaintiff's constitutional claims because they had probable cause to arrest him.**

A warrantless arrest violates the Fourth Amendment if no "probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). The Supreme Court defines probable cause as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S at 37; *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (adding that probable cause "depends on the *totality of the circumstances*" (emphasis added)). Courts assess probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Korstrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001).

The Sixth Circuit cautions that neither "a bare allegation of criminal wrongdoing," *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008), nor "an individual's mere presence at a crime scene," *Harris v. Bornhorst*, 513 F.3d 503,

515 (6th Cir. 2008), constitutes probable cause for arrest. And the Circuit requires an officer to consider "both the inculpatory *and* exculpatory evidence[] before determining if he has probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis original); *see also Parsons*, 533 F.3d at 501 ("Police officers may not make hasty, unsubstantiated arrests with impunity, nor simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." (internal citations and quotation marks omitted)). *But see Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001) ("But once a police officer *has* sufficient probable cause to arrest, he need not investigate further." (emphasis original)).

Still, the Supreme Court has explained that probable cause "is not a high bar," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (internal citations and quotation marks omitted); *see also Barrera v. City of Mount Pleasant*, 2021 WL 4005634, at *2 (6th Cir. July 29, 2021) (reiterating that "probable cause does not establish a high bar" (internal citation and quotation marks omitted)); *Criss*, 867 F.2d at 262 ("The quantum of proof required to establish probable cause is significantly lower than that required to establish guilt."). Furthermore, the Court has determined that "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the

13

second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802 (1971) (holding that officers did not violate the Fourth Amendment by mistakenly arresting Miller instead of Hill, when Miller was in Hill's apartment and matched Hill's physical description).

Additionally, the Sixth Circuit has held that "probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989); *see also U.S. v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) ("When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause. Likewise, when a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause . . . .").

The Sixth Circuit has recently clarified that "the ultimate question of probable cause (separate from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020).

In this case, the undisputed facts establish that Detective Garcia had probable cause to order Plaintiff's arrest. Both parties agree that Detective Garcia based his decision on two pieces of evidence. (ECF No. 39, Motion for Summary Judgment,

14

PageID 324–25; ECF No. 40, Opposition to Motion for Summary Judgment, PageID 395). First, Detective Garcia knew that Mr. Merhi had selected Plaintiff's photo from a lineup, provided a physical description that closely matched Plaintiff, and stated that he saw Plaintiff—for the first time in his life—on Ms. Waterman's office floor around the time of the theft. Second, Detective Garcia had video surveillance that confirmed that a car registered to Plaintiff left Ms. Waterman's office building shortly after the theft. Taken together, these pieces of evidence strongly suggested that Plaintiff was at Ms. Waterman's office during the theft. Notably, neither party suggests that Detective Garcia had any reason to believe that Plaintiff worked in or had any busines at Ms. Waterman's private office. Nor does either party suggest that anyone at Ms. Waterman's office identified any other suspects. Therefore, it was reasonable for Detective Garcia to infer that there was a "probability" that Plaintiff took Ms. Waterman's wallet. *Wesby*, 138 S. Ct. at 586; *see also Brown v. Howard*, 2015 WL 1906452, at *6 (N.D. Ill. Apr. 27, 2015) ("while there are innocent explanations for Plaintiff's conduct . . . the officers' inference that Plaintiff took the wallet is at least as probable as any innocent inference").

None of Plaintiff's claims suggest otherwise. The facts that Ms. Waterman did not identify a suspect (ECF No. 40, PageID 394), and that two other people did not pick anyone out of photo lineups that included Plaintiff (ECF No. 40, PageID 394), merely suggest that those three did not see the Plaintiff, nor the theft. And the

fact that Detective Przybyla determined that Plaintiff was likely not the perpetrator, *after* he saw and heard an explanation from Plaintiff in person (ECF No. 40, PageID 397), does not change the weight of the evidence that Detective Garcia had *before* the arrest and interrogation. Thus, the objective circumstances within Detective Garcia's knowledge at the time he ordered Plaintiff's arrest amounted to probable cause as a matter of law.

These circumstances also established probable cause for Officers Clark and Alfrey to carry out Plaintiff's arrest. Because Detective Garcia directed the officers to act, the Court must "consider [Detective Garcia]'s knowledge in determining whether there was probable cause." *Woods*, 544 F.2d at 260. Therefore, because Detective Garcia had probable cause to order the arrest, Officers Clark and Alfrey had probable cause to effectuate it—even if, as Plaintiff alleges (ECF No. 40, PageID 395–96), they did not ask Detective Garcia what that probable cause was.

For these reasons, the Court finds that Defendants did not violate the Fourth Amendment and grants them summary judgment on Plaintiff's constitutional claims.

**B.    Defendants are entitled to summary judgment on Plaintiff's state intentional tort claims because they have governmental immunity.**

Pursuant to MCL 691.1407(3), Michigan courts will immunize a government employee from intentional tort liability if he can satisfy the "*Ross* test," which requires him to establish that: "(1) [his] challenged acts were undertaken during the course of employment and that [he] was acting, or reasonably believed he was acting,

within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne County*, 760 N.W.2d 217, 218 (Mich. 2008) (citing *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 667–68 (Mich. 1984)).

Defendants argue that: (1) they "were acting within the course of their employment as police officers when they detained and investigated Plaintiff"; (2) "[t]here is no evidence the officers investigated [Plaintiff] out of malice," given that Plaintiff "was never charged with a crime and [] was released in a matter of hours"; and (3) "the decision to detain and investigate Plaintiff [was] a discretionary one, as officers must exercise judgment when deciding who to investigate and how." (ECF No. 39, Motion for Summary Judgment, PageID 327). Plaintiff does not address this test in his Opposition. (ECF No. 39, Opposition to Motion for Summary Judgment).

Based on the undisputed facts in this case, Defendants satisfy the *Ross* test, and thus are immune to Plaintiff's state tort claims.[2]

---

[2] Defendants are also correct that "the wrongful imprisonment claim must be dismissed because Plaintiff was lawfully detained and investigated." *See Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 361–62 (Mich. 2003). This Order focuses on Defendants' governmental immunity because it defeats both Plaintiff's false imprisonment claim and his intentional infliction of emotional distress claim.

### i. Defendants were acting within the scope of their authority.

To receive common-law immunity from intentional tort claims, a government employee must prove that his contested actions "were taken during the course of employment and that [he] was acting, or reasonably believed he was acting, within the scope of his authority." *Odom*, 760 N.W.2d at 224 (internal citations, quotation marks, and alterations omitted).

In this case, both parties agree that Defendants were acting in the course of their employment and within the scope of their authority. (ECF No. 9, Amended Complaint, PageID 57, 63 72; ECF No. 14, K. Alfrey, G. Noe, and G. Przybyla Answer, PageID 135; ECF No. 15, D. Clark Answer, PageID 154; ECF No. 40, Opposition to Motion for Summary Judgment, PageID 400).

### ii. Defendants were acting in good faith.

A government employee must also establish that he acted "in good faith." *Odom*, 760 N.W.2d at 224. A government employee lacks good faith if he "acts *maliciously* or with a *wanton* or *reckless disregard of the rights of another*." *Id.* at 225 (emphasis original). In other words, he lacks good faith if his conduct "shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id.* "[M]ere ignorance does not constitute conduct so reckless as to demonstrate" a lack of good faith, *Xu v. Gay*, 668 N.W.2d 166, 171 (Mich. App. 2003), but "capricious action" does. *Odom*, 760

18

N.W.2d at 225. "The good-faith element of the *Ross* test is subjective" and "protects a defendant's honest belief and good-faith conduct." *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (quoting *Odom*, 760 N.W.2d at 229).

Notably, in *Odom*, the Michigan Supreme Court specifically stated that "[a] police officer would be entitled to immunity under *Ross* if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken." *Odom*, 760 N.W.2d at 229.

Here, the undisputed evidence shows that Detective Garcia acted in good faith. Nothing in the record suggests that Detective Garcia disliked or even knew Plaintiff before this incident. Neither did Detective Garcia decide to arrest Plaintiff randomly: he interviewed Ms. Waterman (ECF No. 39-2, Statement of K. Waterman, PageID 338–40), retrieved security footage (ECF No. 40-1, Dep. of N. Garcia, PageID 426), and created lineups (ECF No. 40-1, Deposition of N. Garcia, PageID 431). By the time he ordered Plaintiff's arrest, he had an eyewitness who had identified Plaintiff at the scene and a video that had captured Plaintiff's car leaving the scene. (ECF No. 40-1, Dep. of N. Garcia, PageID 424–26). Furthermore, as soon as Detective Przybyla told Detective Garcia that Plaintiff did not appear to be the suspect in the video, Detective Garcia told Detective Pryzbyla to discharge him. (ECF No. 40-1, Dep. of G. Przybyla, PageID 545). Detective Garcia then reasonably believed that Plaintiff was released, based on a copy of the paperwork

that Detective Przybyla filed. (ECF No. 40-1, Dep. of N. Garcia, PageID 433–34). All of this demonstrates that Detective Garcia believed that he had probable cause to order Plaintiff's arrest, and that he acted with at least some care for Plaintiff's well-being.

The undisputed evidence also shows that Officers Clark and Alfrey acted in good faith. The officers did not participate in the investigation and did not make the decision to arrest Plaintiff. Moreover, they were, at the very least, told by Detective Garcia that there was probable cause for the arrest. (ECF No. 40-1, Dep of D. Clark, PageID 644–46, 658; ECF No. 40-1, Dep. of K. Alfrey, PageID 687). And Plaintiff has not alleged that they mistreated him when they did arrest him.

### iii.  Defendants' actions were discretionary.

Lastly, an employee must demonstrate that his acts were "discretionary." *Odom*, 760 N.W.2d at 225–26. This requirement allows employees engaged in "deliberation, decision and judgment" to "resolve problems without constant fear of legal repercussions." *Id.* at 226. At the same time, it leaves open to liability "ministerial officers" who fail to follow the "line of conduct marked out for" them. *Id.*

Both the Michigan Supreme Court and the United States District Court for the Eastern District of Michigan have characterized police officers assessing probable cause as a discretionary act. *Id.* (stating that "[p]olice officers perform many

discretionary acts each day," including when they determine "whether there is reasonable suspicion to investigate or probable cause to arrest"); *Fantroy v. Vann*, 2015 WL 5244342, at *9 (E.D. Mich. Sept. 8, 2015) ("Under Michigan law an officer's decisions regarding an arrest are considered both discretionary and within the scope of their authority."). Similarly, the Eastern District has found that the execution of a search warrant "involves considerable discretion in terms of how to conduct the search, what efforts to undertake to effectuate the search, and judgment in determining when to conclude the search." *Pillow v. Henry*, 2021 WL 3869906, at *6 (E.D. Mich. Aug. 27, 2021).

Defendants' actions were discretionary here. Detective Garcia decided what evidence to collect, and then decided, based on that evidence, to ask for Plaintiff's arrest. (ECF No. 40-1, Dep. of N. Garcia, PageID 424–26, 431). Later, after Detective Przybyla called him, Detective Garcia used his judgment to authorize Plaintiff's discharge the day of his arrest by DPD. (ECF No. 40-1, Dep. of G. Przybyla, PageID 545, 548).

Officers Clark and Alfrey both thought that they verified, in at least some small way, the probable cause for arresting Plaintiff. (ECF No. 40-1, Dep. of D. Clark, PageID 644; ECF No. 40-1, Dep. of K. Alfrey, PageID 699). But even if they did not assess probable cause in this case, their general practice of doing so suggests that they have the option of declining to arrest, and therefore that they *chose* to

comply with Detective Garcia's request. Furthermore, there is no indication that Detective Garcia told the officers when, where, or how to effectuate the arrest. Just as officers use their discretion to determine how to conduct a search pursuant to a warrant, *Pillow*, 2021 WL 3869906, at *6, Officers Clark and Alfrey used their discretion to determine how to conduct this arrest. They were not simply "completing activity logs and police reports or following the procedures for booking an arrested person." *Odom,* 760 N.W.2d at 226.

Accordingly, the Court grants summary judgment to Defendants on Plaintiff's false imprisonment and intentional infliction of emotional distress claims.

### C. Defendants are entitled to summary judgment on Plaintiff's gross negligence claim because it is fully premised on his intentional tort claims.

Although plaintiffs "may bring common-law negligence claims based on allegations that could also undergird intentional-tort claims," they "are barred from bringing gross-negligence claims . . . if those claims are 'fully premised' on alleged intentional torts." *Brent v. Wayne County Department of Human Services*, 901 F.3d 656, 701 (6th Cir. 2018) (quoting *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. App. 2004), *overruled on other grounds by Odom*, 760 N.W.2d 217). For example, in *Fantroy*, the Eastern District of Michigan found that a Plaintiff "fail[ed] to state a claim for gross negligence under Michigan law" because his "gross negligence claim rest[ed] on precisely the same facts as his intentional tort claims of

22

false arrest, false imprisonment, and intentional infliction of emotional distress." *Fantroy*, 2015 WL 5244342, at *4 ("Michigan law does not recognize 'gross negligence' as an independent cause of action where the underlying facts support an intentional tort allegation." (citing *Bletz*, 641 F.3d at 756)); *see also Harmon v. Harper*, 2020 WL 3013890, at *4 (W.D. Ky. June 4, 2020) ("A plaintiff cannot support a claim for negligence or gross negligence with the same factual allegations as a false arrest or malicious prosecution claim because it would allow the plaintiff to circumvent the 'higher standards' associated with those intentional torts.").

As Defendants point out, Plaintiff's gross negligence claim is indeed based on precisely the same facts as are his intentional tort claims. Therefore, pursuant to *Brent*, this Court grants summary judgment for the Defendants on Plaintiff's gross negligence claim.

**CONCLUSION**

For the reasons listed above, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DISMISSES** Plaintiff's Amended Complaint **WITH PREJUDICE**.


IT IS SO ORDERED.

Dated: October 8, 2021

s/Paul D. Borman
Paul D. Borman
United States District Judge

23